Filed 5/16/16  P. v. Dean CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B253077 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA396890) |
| v. | |
| GARRY DEAN, | ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on April 25, 2016 be modified as follows:

1.  On page 13:  Section 8, subsection a, of the Factual and Procedural Background is deleted, and the following paragraph is inserted in its place:

a. *Judge Lomeli's pretrial rulings*

The case was assigned to Judge Lomeli for trial. After extensive argument over the admissibility of evidence about the Powers murder, Judge Lomeli ruled the evidence that Powers had been killed because of his intention to testify against three Bloods gang members, that he was in the company of Batiste when he was killed and that Batiste may have been killed because he was a witness to the Powers murder was admissible against all three defendants. Further, any evidence Dean had provided to the police about the murder of Powers was admissible against each defendant. Judge Lomeli concluded this evidence was relevant to the defendants' motives for the killing of Batiste and the conspiracy to kill Dean and would provide jurors with some context for the charges. The People's request to introduce evidence relating to the firearm and ammunition linked to Green and Green's use of the gun to shoot Ravenel was denied because there was no definitive proof that weapon had been used to kill Powers and none of the defendants had been charged with his murder.

2. On page 21, section 3 of the Discussion: The subsection heading is deleted and the following subsection heading is inserted in its place:

a. *The procedural background and the court's ruling that the prosecutor could refer to DNA results from Kennedy's car*

There is no change in the judgment. Respondent's petition for rehearing is denied.

_____

PERLUSS, P. J.             ZELON, J.             SEGAL, J.

2

Filed 4/25/16  P. v. Dean CA2/7 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B253077 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA396890) |
| GARRY DEAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Reversed and remanded.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Garry Dean appeals from the judgment entered after a jury convicted him of the murder of Alton Batiste and found true a special gang enhancement allegation. Although we reject Dean's claim the prosecutor engaged in prejudicial misconduct by dismissing the case and immediately refiling the charges in a different district to avoid an unfavorable in limine ruling, we agree with his contention the combined effect of the prosecutor's several improper statements during closing argument and the trial court's erroneous "corrective" ruling that permitted the prosecutor to discuss DNA results not in evidence deprived Dean of his constitutional right to a fair trial. Accordingly, we reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Overview of the Murders of Alton Batiste, Travon Powers and Dawan Banks*

The complicated facts presented at trial, as well as the evidentiary rulings and arguments of counsel at the center of Dean's appeal, arise from three, perhaps related, murders.

a. *Alton Batiste*. At approximately 1:30 a.m. on September 23, 2002 a van crashed into the divider on the Santa Monica Freeway in West Los Angeles. Dean, a member of the Center Park Bloods, was one of the individuals in the van. Lynette Pennington, also a member of the Center Park Bloods, was the driver of the van, which was registered to Robert Burke, her incarcerated boyfriend. Batiste, severely injured by knife wounds, was in the van when it crashed. He died nine days later.

b. *Travon Powers*. Several hours before the van crash Batiste had been with Travon Powers, a member of Centinela Park Family, also a Bloods-affiliated criminal street gang, when Powers was murdered. Powers's body was found shortly before midnight on September 22, 2002 in Center Park, the neighborhood claimed by the Center Park Bloods. A car belonging to Powers's girlfriend, Tessy Kennedy, had crashed into a low fence nearby; blood stains were found on its front seats. According to Kennedy, Powers and Batiste had left an Inglewood motel together in her car around 10:20 that evening to look for drugs.

2

c. *Dawan Banks*.  Powers's murder occurred several days before he was scheduled to testify at a preliminary hearing to identify three members of the Neighborhood Pirus, another Bloods-affiliated gang, as the individuals who had shot and killed Dawan Banks in February 2002.

The prosecution's theory was that Powers had been killed because he intended to testify against three Bloods gang members and that Batiste, who had been with Powers, had likely been killed by Dean and Pennington because he had been a witness to Powers's murder.  One of the alternate possibilities suggested by Dean's defense counsel, on the other hand, was that Batiste may have been stabbed in Kennedy's car and was simply being transported to the hospital in the van in which Dean was riding when it crashed on the freeway.  In connection with that theory, defense counsel questioned the source of the blood found on the front seats of Kennedy's car.[1]

2. *The Murder of Alton Batiste*

In the early morning of September 23, 2002 a witness seated in a car overlooking the Santa Monica Freeway in West Los Angeles saw a van travel across the freeway lanes, hit the freeway divider and come to a stop.  An African-American man wearing a light-colored shirt got out of the van, followed by another African-American man wearing a red shirt.  The witness later identified Dean as the man in the red shirt.  Dean and the second man pulled an individual out of the van and carried him across the lanes to the shoulder of the freeway.  The first two men returned to the van, pulled out what could have been a small person or a duffel bag and carried it to the side of the freeway.  The two uninjured men wandered around, looking confused.  The man in the light-colored shirt walked

---

[1]     Pennington  was also charged with Batiste's murder.  Pennington and Jason Green, a third Center Parks Bloods member, were charged in the same information with conspiring to murder Dean several months later, purportedly because Green was concerned Dean would implicate him in the murder of Powers.  Dean, Pennington and Green were tried together.  Dean's case was heard by one jury; Pennington's and Green's by a second jury.  Pennington's and Green's appeals from their convictions are pending in this court.

halfway up the embankment above the shoulder of the freeway and then returned to the van. The witness called the police emergency hotline.

By the time emergency personnel arrived, the two men had disappeared. The witness directed them to the injured man on the side of the freeway, who was later identified as Batiste. Batiste was lying on his back in a pool of blood. He was moving, although incoherent, and was transported to UCLA Medical Center. California Highway Patrol Officer Arthur Dye inspected the van. According to Dye, the rear passenger door of the van was inoperable. The front interior of the van was covered in blood; and, although the driver's side windshield was cracked, there was no glass in the van or any blood or hair on the windows. Blood was smeared on the dashboard in front of the passenger seat, and a red jersey soaked in blood lay in front of the passenger seat. The passenger seat was bent forward toward the steering wheel, and both the steering wheel and the key in the ignition were bent to the side. A purse on the floor of the van contained Pennington's checkbook and California identification card. Dye also found a key from an Inglewood motel in the fast lane of the freeway next to the van. Dye ordered the van towed from the freeway.

After CHP officers had arrived, the witness saw Dean using a pay phone near the intersection of National Boulevard and Westwood Boulevard and pointed him out. Dean wore a red jersey, dark pants and red Converse sneakers. Small drops of blood were on Dean's shirt and shoes, and he had a bloodstained red bandana wrapped around his right hand. Dean told the officers he had been in the van collision and was using the pay phone to call for help.[2] He said his girlfriend, Nette, had been driving the van. Although he initially told the officers he had been in the rear passenger seat, he later said he was in the front seat. He provided his name, address and telephone number at the officers' request. When asked about the injured passenger, Dean answered, "He's not my friend. I don't

---

[2]     All tapes of emergency calls concerning the incident were lost. The initial dispatch reported four Black men had emerged from the van, not including Batiste, who was carried from the van.

4

even know the guy." When Dean complained about pain in his hand and said he felt ill and dizzy, one of the officers called an ambulance. The officers left after receiving a radio call about another traffic collision.

Officer Dye went to UCLA Medical Center after leaving the accident scene and learned Batiste had suffered several puncture wounds.[3] The other officers returned to the pay phone but could not locate Dean. The case was assigned to Los Angeles Police Detective Joel Price for investigation.

3. *LAPD's Investigation of Batiste's Murder*

Later in the morning on September 23, 2002 Pennington sought medical treatment at a Gardena hospital, complaining of pain in her left shoulder and a laceration above her left eye. She reported she had been punched in the face by a man and had lost consciousness. After treating and discharging her, the hospital reported the assault to the police. Pennington told the police she had been carjacked that night while driving Burke's van. Detective Price spoke with Pennington two days later after learning she had reported the van stolen. According to Price, Pennington was vague about the details but claimed she had been carjacked between 12:30 and 1:00 a.m. She said she had been punched in the head, lost consciousness and was concerned she had been sexually assaulted. She did not explain why she waited to obtain treatment or to report the van as stolen.

On October 1, 2002 Detective Price accompanied an LAPD criminalist to the towing yard to search the Burke van. Price observed the van's rear door was hinged (rather than sliding) but fully operable and saw drops of blood inside the doorframe. The criminalist found 27 stains that tested presumptively positive for blood and collected the bloodstained red shirt, the purse, some keys on a chain, a sneaker with red stripes, two

---

[3]     Batiste suffered three stab wounds to his forehead that were forceful enough to penetrate his skull. Batiste also suffered stab wounds to the right front of his torso that penetrated his chest wall, diaphragm and liver and cuts to his right external jugular vein, trachea and esophagus. He had fractures of the eye socket and nose from blunt force trauma, scrape marks on his left shoulder and forearm that looked like road rash and abrasions on his knuckles. He died on October 2, 2002.

cameras, a phone and a phone battery. DNA profiling on various stains recovered from the van were linked to Batiste, Pennington and Dean.[4] A stain from the upholstery of the front passenger seat matched Batiste's profile; Dean and Pennington were excluded as contributors. A swab from the steering wheel was primarily attributed to Batiste, but Pennington could not be excluded. A stain on the middle bench seat contained primarily Dean's DNA but Pennington could not be excluded. A stain from the carpet between the middle and rear bench seats contained Dean's DNA. None of the tested stains contained a mix of Dean and Batiste's DNA. The drops in the interior doorjamb of the rear passenger door, as well as stains on the exterior of the door, were never tested.

In January 2003 Detective Price, who had unsuccessfully searched for the Batiste murder weapon in October 2002, returned to the freeway embankment with a CalTrans crew that cut the vegetation to facilitate the search. A seven-inch kitchen knife was found near the location described by the witness to the collision. Forensic tests did not recover any trace of fingerprints or blood from the knife.

4. *The Possible Powers Connection*

Early in the investigation Detective Price learned the Inglewood Police Department (IPD) wanted to question Batiste, who remained in a coma, about the Powers murder, which had occurred an hour or so before the van collision. Kennedy told Inglewood police she and Powers had gone at Batiste's invitation to an Inglewood motel that night to party with Batiste and his girlfriend. A few days earlier an IPD officer had relocated Powers to a downtown Los Angeles hotel and warned him not to return to Inglewood before the hearing. When Powers and Kennedy arrived at the motel, there was no party. Powers and Batiste then left together in Kennedy's car but did not return. According to Kennedy, Powers had a reputation as a snitch. A Bloods-affiliated gang member had yelled "J-Rock" while shooting at some 60's Rolling Crips gang members. Powers, known as "Lil J-Rock," was "green-lighted," or targeted, by Bloods-affiliated gangs after

---

[4]     The source of the DNA was not necessarily blood; it could have been saliva, sweat or any other DNA cell source.

he told the police another Bloods gang member was known as "Big J-Rock." Big J-Rock was convicted of murder for the shooting. Kennedy also testified Powers had told her Batiste's sister was dating one of the Neighborhood Piru gang members who had shot at Powers and killed Banks. Batiste's wife told Price that Batiste had received several phone calls from that person.

  5. *The Wiretap Evidence*

  Shortly after Batiste's death on October 2, 2002, LAPD and IPD detectives jointly obtained an order authorizing wiretaps on telephone numbers linked to the deaths of Batiste and Powers. The numbers included Pennington's landline and cell phone and the number Dean had given the officer the night of the crash.[5] A Los Angeles County jail number was added when detectives realized Pennington was receiving numerous calls from someone known as "B-Lok," eventually identified as Green, who was incarcerated following his negotiated plea to a charge of assault with a firearm for shooting at Tyrone Ravenel, another Inglewood gang member. On December 3, 2002 Green called Pennington, expressed concern about "Shady Blood" and told her to meet with "CKay" and "Nut" to discuss what to do about him. (Detective Price believed that the moniker Shady Blood, which the gang expert testified would indicate someone in the gang is dirty, dishonest or a snitch, referred to Dean and that the other gang members were conferring about killing Dean.) Pennington told Green she had spoken with CKay the previous evening and he had said, "That's on Blood. . . . You ain't fittin' to go down. I ain't fittin' to go down. It's too many lives at stake." Green told Pennington not to talk on the phone and agreed that lives were at stake. He said, "On Blood, this gonna be handled," and indicated he would have to trust CKay. After that call Pennington called other gang members to set up a meeting.

---

[5] According to Dean, the number belonged to his girlfriend. The same number was listed in a phone book found in Pennington's purse under the name "Skoobee Red." On October 8, 2002 Detective Price interviewed Pennington again about the carjacking and showed her a photographic lineup containing a picture of Dean. Pennington denied knowing anyone in the lineup.

A wiretapped conversation on December 5, 2002 between Dean and Pennington revealed that Dean also believed his fellow gang members thought he had "spoke on somebody" and wanted him "gone." Dean asked Pennington where she had heard this information, and Pennington replied she had been hearing it "a whole lot." Dean denied talking and said he wanted to know who was putting "mud" on him. When Pennington claimed she did not know what was happening, Dean said he was coming to the "turf" to find out. Pennington immediately called several other gang members, telling the first, "We got a problem," and then told all of them she had talked with "Shady Blood" and complained he knew he was being targeted because someone else was talking too much. The next day she spoke with Green and told him the same thing.

In a December 19, 2002 call Pennington told Green she would be visiting him the next day at the county jail. Green told her he had his "little flash cards" ready, and Pennington said she had hers as well. After listening to the call, Detective Price asked county jail deputies to seize any writings between Green and his visitor.[6] The next day Los Angeles County Sheriff's deputies monitored Pennington's visit with Green and approached him after she left. Green attempted to put several small pieces of paper in his mouth but failed when the deputies grabbed his hand. The deputies retrieved several pieces of paper, which Price reconstructed. The first note, written by Green, read, "The business is: To find out exactly where that nigga is at. . . . I'm sure you know by now. Shady in the Queen streets tellin' niggas I did that shit. On Bloods. Babe, that nigga got to be X'd quick." A second page read, "The business is: Ckay, Bo-Legs & Chip get'in Shady— Now! . . . As far as any pillow talkin Shady did, that would be considered 'hearsay' . . . in the court of law. So we'll get the hoe when we can. We need Shady X'd now!!! Like yesterday." The third page read, "Shady is trying to fuck us off for some reason! I assume because (he fucked up from the very start!) when he gave your name. Now he can't stop

_____

[6]     Visitor conversations were monitored, and jail rules prohibited the exchange of information in writing during visits.

8

telling." The reverse side gave instructions on contacting a Bloods prison gang shot caller "to get his ass down here immediately . . . ."

Meanwhile, Detective Price met with Dean twice after he was jailed for a probation violation to warn him his life was in danger and to seek his cooperation. Dean denied being involved in, or knowing anything about, the freeway collision or the murders of Powers and Batiste. He also denied he had been the person questioned at the phone booth the night of the accident even after he was told he had been identified by the CHP officers.

6. *The Initial Filing and Dismissal of Charges*

The case languished for several years. On August 11, 2009 murder charges were filed against Dean and Pennington in the Airport Branch (West District) of the Los Angeles Superior Court. After a preliminary hearing Dean was arraigned on March 1, 2010 on one count of first degree murder (Pen. Code, § 187, subd. (a))[7] with a special allegation he had personally used a deadly or dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)). Pennington was charged with one count of murder. Both Pennington and Green were charged with one count of conspiracy to murder Dean (§§ 182, subd. (a)(1), 187, subd. (a)). As to both the murder and conspiracy to commit murder charges, the information alleged the crimes had been committed to benefit a criminal street gang. (§ 186.22, subd. (b)(4).)[8]

While the case was pending in the West District, several pretrial motions were heard by Judge James Dabney, who had deemed trial to have commenced on April 23, 2012. On April 25, 2012 Judge Dabney heard argument on the People's request to present evidence related to the murder of Powers and the shooting (attempted murder) of Ravenel. To establish that Batiste was killed because he had witnessed Powers's murder and that Green

---

[7]     Statutory references are to this code unless otherwise indicated.

[8]     For simplicity this opinion uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that, in the statutory language, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b); see *People v. Jones* (2009) 47 Cal.4th 566, 571, fn. 2.)

wanted Dean dead because he feared Dean would implicate him in the murder of Powers, the prosecutor proposed introducing the following evidence: (1) Two men were seen running from the scene of Powers's murder, one wearing a white shirt and one wearing a red shirt. Photographs developed from the camera found in the crashed van showed Green wearing a bright red jersey and throwing gang signs in Center Park. (2) A Bryco nine-millimeter handgun with an intact serial number was found in Kennedy's car after Powers was killed. The gun was loaded with rounds manufactured by the Fiocchi and Federal companies. Two expended Fiocchi rounds were found at the scene of Powers's murder. When Green and Pennington were detained leaving an apartment a few weeks after the murders of Powers and Batiste, the police found a gun box in the apartment with the same serial number as the gun found in the car, as well as a partially filled tray of nine-millimeter ammunition that included Fiocchi and Federal rounds. (3) The casings found at the scenes of the Powers and Ravenel shooting were fired from the gun found in Kennedy's car. (4) Powers was killed because he twice had provided information to the police, once when he told investigators there was more than one J-Rock, a comment that led to the other J-Rock's conviction of murder, and later when he was scheduled to testify at the preliminary hearings of the three Neighborhood Pirus charged with shooting him and killing Banks. (5) Powers and Batiste had left the Inglewood motel together the night of their murders.

All defendants opposed admission of the evidence proposed by the People, arguing there was no evidence the gun linked to Green had, in fact, been used to kill Powers[9] or that any of the defendants had been present at the Powers shooting. Defense counsel argued the People were simply seeking to bolster the weak Batiste case with inflammatory and prejudicial evidence from the uncharged murders. (See Evid. Code, § 352.) Judge Dabney agreed and ordered the People not to mention the gun evidence or the Ravenel shooting. He indicated he was still undecided about allowing evidence Powers had been murdered only

---

[9]     The only bullet recovered from Powers's body was damaged and yielded no usable identifying marks.

10

hours before the van collision but instructed the prosecutor to assume that evidence would not be admissible.

After consulting with his supervisors, the prosecutor elected to dismiss the case: "[T]he People are unable to proceed . . . [and] will move to dismiss and immediately refile. I've informed counsel of our intention to file and to have the defendants arraigned tomorrow." Although the prosecutor did not mention the statutory ground for the dismissal, the minute order stated, "The People announce unable to proceed. On [the People's] motion, case is dismissed pursuant to section 1385."[10]

7. *Refiling of the Case in the Central District*

The same day as the dismissal the prosecutor refiled the case in the Central District under a new case number. Green promptly moved to transfer the case to the West District, arguing the prosecutor had engaged in improper forum shopping after receiving an adverse evidentiary ruling from Judge Dabney in violation of defendants' right to a speedy trial and dismissal statutes.

The motion was heard on June 20, 2012 by Judge George Lomeli. Asked the basis for the dismissal, the prosecutor claimed the People had moved to dismiss pursuant to section 1382, rather than section 1385, because they were unable to proceed at that time based on the court's rulings. Pressed by the court, the prosecutor, who acknowledged it had been his case, stated he could not identify any missing evidence or witnesses that might have justified dismissal under section 1382 without reviewing his notes. Judge Lomeli then asked, "Can you represent to this court that it was done or not done because the rulings were going against you?" The prosecutor answered, "I can say that was a factor in the People's decision; that because of the evidentiary rulings, there were going to be many . . . facts that were not going to be presented to the jury that went to the guilt of the defendants." Concerned, Judge Lomeli said, "Well, I've got to tell you that that doesn't sit well with the

---

[10]     In accepting the People's request to dismiss, the court rejected a defense request the case be refiled under the same number "because [the People are] not dismissing and refiling under section 1387. . . . That's not the nature of the refiling here."

court. In terms of using that as a tactical . . . strategy, if you will, because rulings were going against you . . . , I hope that isn't the case. . . . I'm going to rule without prejudice. And if counsel can provide a more accurate record—I hope that isn't a factor, that you announced unable to proceed because rulings were going against you. I've never seen anything like that. . . . But hearing what you have to say, that it is a possible factor, that's disturbing. I will allow you an opportunity to further brief that part of it . . . ." As to the defendants' requested transfer back to the West District, Judge Lomeli ruled the case had been properly filed in the Central District because certain of the conversations relevant to the conspiracy had occurred at the county jail[11] and previous rulings were "irrelevant and non-binding." He repeated, however, he was not ready to rule on whether the prosecution had used the dismissal to gain a tactical advantage. The court also addressed defendants' severance motion, which it denied.

Following several additional continuances, Dean moved to dismiss the case based on prosecutorial misconduct and forum shopping. In opposition the prosecutor argued the People had originally dismissed the case to perform additional DNA testing and to transcribe additional conversations. The motion was heard by Judge Michael Abzug. When pushed by the court about his reason for dismissing, the prosecutor acknowledged the case was dismissed in part for reevaluation after the adverse evidentiary ruling. Judge Abzug concluded that, absent some showing of concrete prejudice, the prosecutor had acted within his discretion to dismiss and refile. Moreover, the possibility of a ruling more favorable to the People was speculative at this juncture. In denying the motion Judge Abzug found the dismissal had been motivated by the adverse ruling but was not made "*to 'circumvent' it.*"

---

[11]    Los Angeles Superior Court Rule 2.3(a)(3) requires the filing of a criminal complaint in the judicial district where the offense was alleged to have occurred and, within that district, at the courthouse serving the area where the offense allegedly occurred. However, where more than one offense is alleged to have been committed and the offenses were committed in different districts, the rule permits the complaint to be filed in any district where one of the offenses was allegedly committed.

12

### 8. *Pretrial and Trial Proceedings*

#### a. *Judge Lomeli's pretrial rulings*

The case was assigned to Judge Lomeli for trial. After extensive argument over the admissibility of evidence about the Powers murder, Judge Lomeli ruled the evidence that Powers had been killed because of his intention to testify against three Bloods gang members, that he was in the company of Batiste when he was killed and that Batiste may have been killed because he was a witness to the Powers murder was admissible against all three defendants. Further, any evidence Dean had provided to the police about the murders of Powers or Batiste was admissible against each defendant. Judge Lomeli concluded this evidence was relevant to the defendants' motives for the killing of Batiste and the conspiracy to kill Dean and would provide jurors with some context for the charges. The People's request to introduce evidence relating to the firearm and ammunition linked to Green and Green's use of the gun to shoot Ravenel was denied because there was no definitive proof that weapon had been used to kill Powers and none of the defendants had been charged with his murder.

#### b. *The People's case*

At trial the People first presented evidence of the crash of Burke's van on the freeway, the condition of the van at the scene, the CHP officers' encounter with Dean and Batiste's injuries. IPD detectives then testified about their efforts to protect Powers before the preliminary hearing for the Neighborhood Piru gang members charged with shooting Banks and Powers's murder. Kennedy testified about Powers's and her meeting with Batiste at the Inglewood motel and Powers's gang history. IPD Officer Kerry Tripp testified as an expert witness about Inglewood gangs. According to Tripp, Inglewood was generally a Bloods-friendly city. The Center Park Bloods or CPB, to which Dean, Pennington and Green all belonged, was a small gang allied with other Bloods gangs, including the Neighborhood Pirus, the Inglewood Family and its spin-off, the Centinela Park Family. Tripp also testified that a gang member who cooperates with police and provides information about other gang members (a "snitch") could be killed and that an order-to-kill (a "green light") had been put out on Powers before his death. Based on a

13

hypothetical that included facts mirroring the evidence about Powers's reputation as a snitch and subsequent murder and Batiste's interaction with Powers before Batiste was found stabbed, Tripp opined the killing of Batiste had benefitted the CPB gang.

In addition to the forensic testing of items and material from the van, the clothing Batiste had worn the night of the collision and the blood-soaked shirt found inside the van were tested for DNA. A partial DNA profile from the back of Batiste's shirt matched Dean's DNA profile. The profile itself was very rare.[12] Another partial profile of an unknown male was found on the inside back collar of the bloody red shirt that also bore Batiste's DNA. Dean's DNA profile was excluded from all stains tested on the red shirt.

William Chisum, a retired criminalist and blood-pattern expert, reviewed evidence taken from the van and concluded Batiste had been sitting in the front when he was stabbed by a person sitting behind him. Chisum opined Batiste was not stabbed until he was seated in the van and, because his blood was found on the steering wheel, the collision probably resulted from a struggle after Batiste was attacked. Chisum believed the damage to the seats, which were pushed forward to the left, was caused by someone pushing forward on the seat. Dean's bloody handprint on the middle seat was most likely made when he was leaning into the van while standing outside.

     c. *The defense case*

None of the defendants testified. Marc Taylor, a forensic scientist, reviewed the reports and photographs in the case and concluded it was not possible to determine whether the stabbing of Batiste had occurred in the van or the cause of the collision. The impact of hitting the freeway divider could have injured the van's occupants and derailed the front seat when a rear passenger was thrown into it by the collision. Taylor also explained no DNA mixture had been found, despite the fact such mixtures are usually present when a person cut his own hand while stabbing another person.

---

[12]     The People's DNA expert testified only one in 22 quintillion unrelated individuals would be expected to share this profile; only one in one sextillion individuals in the African-American population would have it.

9. *The Verdicts and Sentencing*

Dean was convicted of one count of second degree murder. The jury found the gang allegation true but was unable to agree on the deadly weapon allegation, which the court dismissed in the interest of justice. Dean admitted his prior serious felony conviction. He was sentenced to an aggregate term of 35 years to life in state prison: 15 years to life on count 1, doubled pursuant to the three strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), plus five years for the serious prior felony conviction (§ 667, subd. (a)(1)). The court ordered Dean to pay various fines and penalties, including a $280 restitution fine, and imposed and stayed a $280 parole revocation fine.[13]

## CONTENTIONS

Dean contends the prosecutor engaged in prejudicial misconduct by refiling the dismissed charges in a different district to obtain a different judge, falsely accusing his counsel of trying to mislead the jury, commenting on his failure to testify during closing argument and disregarding the rules of evidence and other trial rules.[14]

## DISCUSSION

1. *Standard of Review*

"""A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.""" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332 (*Seumanu*).)

Ordinarily, "'[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.'" (*People v. Charles* (2015) 61 Cal.4th 308,

---

[13]     Dean contends, and the People agree, the restitution and parole revocation fines should have been $240 as specified in the court's oral pronouncement of sentence.

[14]     Dean raises several additional claims of evidentiary and instructional error we need not address in light of our reversal of his conviction for prosecutorial misconduct.

15

327; accord, *People v. Williams* (2013) 58 Cal.4th 197, 274.)  "[F]ailure to request the jury be admonished does not forfeit the issue for appeal" if "a timely objection and/or a request for admonition . . . would be futile" or """"an admonition would not have cured the harm caused by the misconduct.""""  (*People v. Hill* (1998) 17 Cal.4th 800, 820; accord, *Seumanu, supra,* 61 Cal.4th at pp. 1328-1329.)

"'A defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law, however, 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'"  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071; accord, *People v. Lloyd* (2015) 236 Cal.App.4th 49, 60-61.)  Bad faith on the prosecutor's part is not a prerequisite to finding prosecutorial misconduct under state law.  (*People v. Hill, supra,* 17 Cal.4th at p. 821; accord, *Lloyd,* at p. 61.)  As the Supreme Court has explained, "'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.'"  (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667; accord, *Lloyd,* at p. 61.)  We review a trial court's ruling regarding prosecutorial misconduct for abuse of discretion.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

2. *The Prosecutor's Alleged Forum Shopping Did Not Constitute Prejudicial Misconduct*

Dean contends the prosecutor engaged in misconduct when he was allowed to dismiss the case pursuant to section 1385 and, instead of refiling it in the West District where it most likely would have been reassigned to Judge Dabney, filed it in the Central District, resulting in assignment to a new judge.  According to Dean, this gamesmanship, even if otherwise permitted by the local rules, was improperly motivated by the desire to obtain a better in limine ruling on the scope of evidence the People could present at trial and thus constituted misconduct within the meaning of the principles discussed above.

Unquestionably, forum shopping by a prosecutor is viewed with disfavor and is expressly targeted by several statutes.  One of the primary purposes of section 1387, for instance, which limits the number of times a prosecutor may dismiss and refile a criminal

16

complaint, is the prevention of forum shopping by prosecutors. (See, e.g., *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1018 ["[s]ection 1387 . . . curtails prosecutorial harassment by placing limits on the number of times charges may be refiled . . . [and] also reduces the possibility that prosecutors might use the power to dismiss and refile to forum shop," citations omitted]; *People v. Traylor* (2009) 46 Cal.4th 1205, 1209 ["[i]n particular, the statute guards against prosecutorial 'forum shopping'—the persistent refiling of charges the evidence does not support in hopes of finding a sympathetic magistrate who will hold the defendant to answer"].)

More directly, when a defendant has successfully moved under section 1538.5 to suppress evidence obtained as the result of an unlawful search or seizure, any subsequent motion made after a dismissal pursuant to section 1385 must be heard by the same judge who originally granted the motion if that judge is available.[15] (See *People v. Superior Court* (*Jimenez*) (2002) 28 Cal.4th 798, 807 (*Jimenez*) [§ 1538.5's legislative history "'makes it clear the Legislature intended . . . to prohibit prosecutors from forum shopping.' [Citation.] To allow the prosecutor to make a judge unavailable to rehear the

---

[15]    Section 1538.5, subdivision (j), provides, "If the case has been dismissed pursuant to Section 1385, either on the court's own motion or the motion of the people after the special hearing, the people may file a new complaint or seek an indictment after the special hearing, and the ruling at the special hearing shall not be binding in any subsequent proceeding, except as limited by subdivision (p)."

Section 1538.5, subdivision (p), provides, "If a defendant's motion to return property or suppress evidence in a felony matter has been granted twice, the people may not file a new complaint or seek an indictment in order to relitigate the motion or relitigate the matter de novo at a special hearing as otherwise provided by subdivision (j), unless the people discover additional evidence relating to the motion that was not reasonably discoverable at the time of the second suppression hearing. Relitigation of the motion shall be heard by the same judge who granted the motion at the first hearing if the judge is available."

The question whether a judge who originally granted a motion to suppress under section 1538.5, followed by the People's dismissal and refiling of the complaint, is "available" to hear a subsequent motion when sitting in a different courthouse is currently pending in the Supreme Court. (See *People v. Rodriguez,* review granted March 11, 2015, S223129.)

17

suppression motion simply by filing a peremptory challenge under Code of Civil Procedure section 170.6 would permit this prohibited forum shopping and 'essentially eviscerate[] the provisions of subdivision (p).'"]

Dean argues there is no rational distinction between a motion to suppress evidence brought under section 1538.5 and the motion in limine originally decided by Judge Dabney and asserts the prosecutor's attempt to obtain a better ruling from a different judge was misconduct. The first contention is patently wrong: At a minimum, section 1538.5 contains an express statutory directive the Legislature has not imposed on other pretrial motions. (Cf. *People v. Superior Court* (*Cooper*) (2003) 114 Cal.App.4th 713, 720 [rejecting defendant's argument to apply the *Jimenez* holding to § 995 motions seeking review of the denial of a motion to suppress; "[p]ursuit of [that] analysis . . . would necessarily result in overstepping our constitutional role to construe statutes as they are, and not rewrite them as we speculate they might be improved"].)

To support the inference of misconduct, however, Dean relies on the longstanding general rule that one trial judge cannot reconsider and overrule an order of another trial judge. Discussing that rule in *People v. Riva* (2003) 112 Cal.App.4th 981 (*Riva*), this court explained, "[F]or reasons of comity and public policy . . . , trial judges should decline to reverse or modify other trial judges' rulings unless there is a highly persuasive reason for doing so—mere disagreement with the result of the order is not a persuasive reason for reversing it. Factors to consider include whether the first judge specifically agreed to reconsider her ruling at a later date, whether the party seeking reconsideration of the order sought relief by way of appeal or writ petition, whether there has been a change in circumstances since the previous order was made and whether the previous order is reasonably supportable under applicable statutory or case law regardless of whether the second judge agrees with the first judge's analysis of that law." (*Id*. at pp. 992-993, fns. omitted; see *People v. Quarterman* (2012) 202 Cal.App.4th 1280, 1293 [quoting *Riva*]; see also *People v. Williams* (2006) 40 Cal.4th 287, 300 [citing *Riva* and the general rule]; *In re Alberto* (2002) 102 Cal.App.4th 421, 424-425, 427 [new judge was without authority

18

to increase amount of defendant's bail; "even if correct as a matter of law, to nullify a duly made, erroneous ruling of another superior court judge places the second judge in the role of a one-judge appellate court"].)

In *Riva* the defendant successfully moved to exclude certain statements he had made to the police on the ground they had been obtained in violation of his right to counsel. After Riva's first trial ended in a mistrial, he renewed the motion before a different judge, who denied the motion. (*Riva, supra,* 112 Cal.App.4th at p. 988.) We concluded the statements were admissible and the judge at the second trial was not bound by the ruling of the first judge. We analogized proceedings after a mistrial to a new trial following reversal on appeal, a situation the Supreme Court has held "'permits [the] renewal and reconsideration of pretrial motions and objections to the admission of evidence.'" (*Riva*, at p. 991-992, quoting *People v. Mattson* (1990) 50 Cal.3d 826, 849 [allowing relitigation of admissibility of a confession at second trial following reversal of judgment on appeal].) Also, like in limine motions, motions to suppress are "intermediate, interlocutory rulings subject to revision even after the commencement of trial." (*Riva,* at p. 992; see *Mattson,* at pp. 849-850 ["Absent a statutory provision precluding relitigation, a stipulation by the parties, or an order by the court that prior rulings made in the prior trial will be binding at the new trial, objections must be made to the admission of evidence (Evid. Code, § 353), and the court must consider the admissibility of that evidence at the time it is offered. [Citations.] *In limine* rulings are not binding."].) We concluded, "it is difficult to see why a new trial after a mistrial should be treated differently in this respect from a new trial after a reversal on appeal." (*Riva,* at p. 992.)

The circumstances presented here—dismissal of an action pursuant to section 1385 and refiling of the charges—are virtually identical to the proceedings after a mistrial at issue in *Riva.* As Judge Lomeli observed, the dismissal of the case by Judge Dabney vacated all preceding orders; there were no orders to which the general rule of comity continued to apply. Thus, Judge Lomeli had the authority to rule anew on the prosecutor's

19

in limine motion. (Cf. *People v. Saez* (2015) 237 Cal.App.4th 1177, 1185 ["[t]o avoid the effects of [a pretrial § 995] ruling, the People could have either appealed it or filed a new accusatory pleading that would have required a new preliminary hearing, but they did neither," citations omitted].)

There being no error by the trial judge, the question remains whether the prosecutor's refiling in a different district—with the stated purpose, at least in part, of obtaining a different result on the motion in limine—was misconduct. Dean argues *Riva* must be distinguished because the circumstances there did not involve forum shopping.[16] Nonetheless, while we view the refiling with disfavor—as did all other judges to consider the prosecutor's conduct—we have found no case suggesting, let alone holding, a prosecutor's permissible refiling of a complaint in compliance with state law and local rules constitutes misconduct, even if the purpose of the refiling was to avoid an adverse ruling. If the essence of prosecutorial misconduct is prosecutorial error (see *People v. Centeno, supra,* 60 Cal.4th at pp. 666-667), we cannot brand a permissible refiling as misconduct warranting retrial.

---

[16]     Justice Johnson, writing for this court in *Riva*, distinguished the decision in *Schlick v. Superior Court* (1992) 4 Cal.4th 310 on the ground "[t]he prosecutor's conduct in *Schlick* amounted to blatant forum shopping, a factor not present in the case before us." (*Riva, supra,* 112 Cal.App.4th at p. 990.) In *Schlick* the Supreme Court construed an earlier version of § 1538.5 to bar the People from relitigating a motion to suppress when an adverse result had led to the dismissal of the complaint under section 1385. The decision in *Schlick* was based on the text of former section 1538.5, subdivision (d), which the Legislature amended after *Schlick* to narrow the circumstances under which a dismissal bars relitigation of such a motion. (See fn. 15, above [discussing § 1538.5, subds. (j), (p)]; see generally *Soil v. Superior Court* (1997) 55 Cal.App.4th 872, 876-880 [discussing amendments to § 1538.5].)

3. *The Prosecutor's Improper Accusations That Dean's Counsel Was Misleading the Jury and His Impermissible Comment on Dean's Failure To Testify, Combined with the Trial Court's Erroneous "Corrective" Ruling That Permitted the Prosecutor To Discuss DNA Results Not In Evidence, Violated Dean's Right to a Fair Trial*

a. *The procedural background and the court's ruling that the prosecutor could refer to DNA evidence from Kennedy's car*

As a result of the court's in limine ruling, the People did not present forensic evidence related to the Powers murder but introduced photographs of the bloodstained seats in Kennedy's car, which was found at the scene. During his cross-examination the IPD detective who had investigated the murder testified the majority of blood—a "significant" amount—was found in the front passenger seat. He also stated he did not think he had submitted the stains for DNA testing. On redirect examination the detective testified he did not remember whether DNA testing had been performed on the blood stains although such testing was typically performed. The court interrupted the prosecutor, who had also asked about shell casings, to inquire whether this line of questioning was permitted under the in limine ruling. The prosecutor asserted the defense had opened the door to testimony about forensic evidence, stating, "If they did ask questions about DNA, the jury would think 'Where was the DNA? How was the DNA processed?' If they get into this, we're entitled to ask questions." The court instructed the prosecutor to move on.

In closing argument Dean's counsel displayed a photograph of the blood stains inside Kennedy's car and noted the absence of evidence of any DNA testing for those stains. After the court sustained the prosecutor's objection, counsel continued: "Now, if you look at the car, you can see the driver's seat and . . . the passenger's seat, and they both look like there's blood on them. . . . What happened?" Defense counsel then told the jury to use "common sense" and that, "if [the stabbing] didn't happen in the van, [the People's] whole story falls apart . . . ." She continued, "There's a reasonable inference that there was some kind of incident that caused bleeding in that car, bleeding on the driver's seat, bleeding on the passenger's seat, something happened, and both of the people who were in the car got

21

out. . . . [W]hatever happened . . . it's entirely possible that Batiste became injured in that confrontation."

Before beginning his rebuttal argument the prosecutor complained to the court outside the presence of the jury that defense counsel's closing argument had referred at length to evidence the court had ruled inadmissible and asked for an appropriate remedy, asserting defense counsel knew the blood in Kennedy's car had been tested and all results had been traced to Powers. Defense counsel objected she had never said it was Batiste's blood and that, according to the DNA report, only the driver's seat had been swabbed. The court ruled the prosecutor could tell the jury the blood stains in the car had been swabbed and the results of those swabs had been traced to Powers.[17]

b. *The prosecutor's improper accusations that defense counsel had been dishonest*

The prosecutor began his rebuttal argument by attacking counsel and the defense:

"[Prosecutor]: Ladies and gentlemen of the jury, good afternoon. A trial is not a game. A trial is a serious matter. And we rely on you to evaluate the evidence and to separate truth from fiction. And what the defense just did to you was try to con you and mislead you into believing things that the defense knew were not true, and let me tell you what I mean by that. [Defense objection overruled.] The defense suggested to you, or argued to you that the blood in Travon Powers' vehicle, in the passenger seat . . . belonged to Alton Batiste, and argued to you—

"[Counsel]: That misstates the argument, Your Honor.

"[The court]: She implied that it could have belonged to Alton Batiste. All right.

"[Prosecutor]: And argued to you that's where he was stabbed. That's the other place that he was—

_____

[17]    In its discussion the court displayed both irritation and impatience with defense counsel. Although it appeared to agree that only those stains that had been analyzed had been traced to Powers—"what was swabbed in the car, it came back to Travon Powers" — its ruling was unclear whether the prosecutor was obligated to indicate that not all of the stains had been tested: "I don't know what was swabbed on that car, but whatever swabbing was done on the vehicle came back to Travon Powers, period. Let's move on."

"[Counsel]: Your Honor, again, that misstates the argument. I never said that.

"[The court]: Again, Counsel, possibly, possibly the location or the venue.

"[Prosecutor]: Okay. That was their theory. And the defense knew—

"[Counsel]: Your Honor, I have to object to that. I was very clear to say we don't know what happened.

"[The court]: Yes, I understand that. The objection is overruled. Go ahead.

"[Prosecutor]: —already knew beyond any question that that crime scene had been tested for DNA. The defense knew whose blood was in that vehicle.

"[Counsel]: And, Your Honor, I'm going to object—

"[The court]: Overruled.

"[Counsel]: —to the implication that it was all tested. It was not all tested.

"[The court]: He didn't say it was all was tested. I didn't hear the word 'all.' Overruled.

"[Prosecutor]: There were eight swabs of DNA. You can imagine that the police wanted to swab that location for DNA. We're talking about the murder of a witness right before the preliminary hearing. They wanted to solve that. They wanted to identify whose blood that was, and eight swabs came back. Did any of them come back to Alton Batiste, as the defense suggested to you? No. None of them did. They all came back to only one person: Travon Powers. Yes, it is the defense who suggests to you that it was Alton Batiste's blood and that he was stabbed there, knowing full well that that was not true.

"[Counsel]: Once again, Your Honor, there's an objection.

"[The court]: Possibly, possibly Alton Batiste's blood that he was stabbed there.

"[Prosecutor]: That's their argument to you. That's their argument to you. That's the level of credibility of the defense.

"[Counsel]: Your Honor, I'm going to object.

"[The court]: Overruled.

"[Prosecutor]: Talk about circumstantial evidence.

"[Counsel]: May we approach?

23

"[The court]: No." (17RT 6112-6114.)

Later, the prosecutor told the jury: "By misleading you about Alton Batiste's blood in Travon Powers's car, they're trying to create some possible or imaginary doubt. . . . Garry Dean was caught red-handed at the scene, and that's why the defense has to argue and mislead you and come up with these imaginary theories, to try to . . . spring him in the face of overwhelming evidence."

c. *The prosecutor's charge that defense counsel had fabricated a defense and discussion of DNA results not in evidence constituted prejudicial misconduct*

Dean contends the prosecutor's rebuttal closing argument improperly maligned his counsel and wrongly accused her of proffering a sham defense. He also argues the court erred in allowing the prosecutor to tell the jury the blood stains in Kennedy's car had been swabbed and those swabs were traced only to Powers.

The Attorney General asserts (as had the prosecutor in the trial court) that defense counsel's use of the photograph of Kennedy's car coupled with her discussion of the absence of any DNA evidence from the bloodstains visible in the car was an improper argument in light of the court's in limine rulings. She then argues the court fashioned a reasonable remedy for this violation, but, perhaps not surprisingly, offers no authority that allows a prosecutor to discuss in closing argument evidence that had not been presented to the jury. In fact, the general rule is that such comments are "'a highly prejudicial form of misconduct, and a frequent basis for reversal.'" (*People v. Hill, supra,* 17 Cal.4th at p. 828; see *People v. Pitts* (1990) 223 Cal.App.3d 606, 722 ["[i]t is settled that 'the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel'"].)

For his part, Dean argues the court's in limine ruling did not address DNA testing of the blood stains in Kennedy's car. Based on the evidence before the jury—including the photograph of the bloodstained seats and the detective's statement he did not believe the blood on the seats had been tested for DNA—he contends his counsel's argument was entirely proper. In addition, the court's attempt to remedy his counsel's purported violation

24

of the earlier ruling deprived him of his opportunity to cross-examine the IPD detective about which portions of the seats had been swabbed. As Dean points out, the jury received no evidence about where the test samples came from, how many samples were taken and not tested or how the samples were handled. Moreover, the defense theory was supported by other evidence admitted at trial. Notwithstanding the absence of any definitive proof of who had been sitting in which seat, Kennedy testified she understood when Batiste and Powers left the motel that Powers would be driving the car, using his own set of car keys. That scenario would have placed Batiste in the bloodier passenger seat. Significantly, the lengthy delay in charging Dean and the other defendants also deprived them of any opportunity to conduct their own testing of the blood stains.

While it is apparent the court believed defense counsel had overstepped the bounds of its in limine ruling, the record does not establish she engaged in improper or unethical conduct. As Dean insists, the record does not indicate either that the DNA test results were expressly excluded or that they were sufficiently comprehensive to exclude the possibility of another contributor. Kennedy's testimony, as well as the extensive blood on the passenger seat, provided plausible support for the theory Batiste had been injured in the car. Under these circumstances allowing the prosecutor to inform the jury as a corrective measure the blood stains had been tested and the testing proved the blood came from Powers was wholly improper.[18] The appropriate response would have been to admonish the jury to disregard the statements by defense counsel about the lack of DNA evidence and not to speculate about such testing. (See *Seumanu, supra,* 61 Cal.4th at p. 1336 ["absent some indication to the contrary, we assume a jury will abide by a trial court's admonitions and instructions"].)[19] The affirmative and unrebuttable statement by the prosecutor that Powers

---

[18] Even if defense counsel had deliberately violated the court's in limine ruling, it is difficult to justify a ruling allowing the prosecutor to inform the jury of a fact not in evidence as a sanction against counsel.

[19] In *United States v. Young* (1985) 470 U.S. 1, 13 [105 S.Ct. 1038, 84 L.Ed.2d 1] the Supreme Court addressed a similar situation in which a prosecutor claimed he was forced to respond harshly toward defense counsel's argument impugning his integrity "in order to

was the source of the blood was not indisputably true and misled the jury to Dean's detriment.

Compounding this error, the court allowed the prosecutor to accuse defense counsel in extremely harsh terms of manufacturing a defense by misrepresenting the state of the DNA evidence. Generally, a prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account, but it is misconduct when he or she disparages defense counsel or accuses counsel of fabricating a defense. (See *Seumanu, supra,* 61 Cal.4th at p. 1337 ["[a] prosecutor may vigorously challenge the validity of any defense, and can characterize the testimony of a witness, including the defendant, as untruthful, but to state or imply that defense counsel has fabricated a defense is generally misconduct"]; *People v. Redd* (2010) 48 Cal.4th 691, 734 ["'[a] prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel'"]; *People v. Hill, supra,* 17 Cal.4th at p. 832 ["'[a]n attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable'"]; cf. *United States v. Pellulo* (3d Cir. 1992) 964 F.2d 193, 218 ["[w]here the defense has made improper remarks, the 'reply' or 'invited response' doctrine permits the prosecution to attempt to neutralize the remarks, so long as he or she does not use the defendant's accusation as a springboard affirmatively to attack the defense"].) "'In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing

'right the scale.'" The Court explained the course that should have been followed: "Plainly, the better remedy in this case, at least with the accurate vision of hindsight, would have been for the District Judge to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond. Arguably defense counsel's misconduct could have warranted the judge to interrupt the argument and admonish him, thereby rendering the prosecutor's response unnecessary. Similarly, the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury." (*Ibid.*, citation omitted; accord, *United States v. Pellulo* (3d Cir. 1992) 964 F.2d 193, 218.)

counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 431-432; accord, *Seumanu,* at p. 1337.)

Plainly, the prosecutor believed, as did the court, that Dean's counsel had violated both the letter and spirit of the ruling limiting the evidence related to the Powers murder that was admissible. As we have explained, however, the record does not support the prosecutor's accusation that defense counsel had tried "to con" or "mislead" the jury by lying about the possibility some of the blood in the car belonged to Batiste. The court did nothing to deter the prosecutor's verbal assault, despite repeated objections by defense counsel. The unchecked accusations by the prosecutor resulted in the jury being told— with no possibility of rebuttal—that the DNA evidence was much stronger than it actually was and that defense counsel could not be trusted. (See *People v. Hill, supra,* 17 Cal.4th at pp. 824-825 [defendant prejudiced when trial court erroneously overruled defense objection to prosecutor's statement blood evidence "pointed unerringly to defendant's guilt" when, in fact, actual blood evidence "was much less damning"]; *Seumanu, supra,* 61 Cal.4th at pp. 1337-1338 ["[t]o the extent the prosecutor here did not simply argue *the defense* was unsupported by facts and thus a sham, but that *defense counsel 'put forward' a sham,* the argument improperly implied that counsel was personally dishonest"].)

d. *The prosecutor impermissibly commented on Dean's failure to testify*

At the end of his rebuttal argument, responding to defense counsel's suggestion that Batiste may have been fatally stabbed while in Kennedy's car, not Burke's van, the prosecutor asked: "Where did they pick Alton Batiste up from? Was it in Inglewood? Or somewhere else? Where did he sustain those injuries? We don't know. We don't have any direct evidence, we don't have that information. We don't know how long he was in that van before it crashed. Garry Dean does. He knows. He's not guilty because he knows, because the defense is correct, he has no obligation to testify, but he does know. And he had a chance to tell the police and he declined to do so. And he not only declined to do so, but he lied to them." Dean contends the prosecutor's comment that he knew the

27

answers to these questions, with the implicit observation he could answer those questions and the explicit, albeit strategically phrased, reference to his failure to do so by testifying at trial,[20] violated his constitutional right not to testify—*Griffin* error. (*Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] (*Griffin*).)[21]

---

[20] In *People v. Wrest* (1992) 3 Cal.4th 1088 the Supreme Court evaluated a similar use of paraleipsis (also known as apophasis), the rhetorical device of stating what was not being argued to suggest exactly the opposite: "Repetition of the statement, 'I am not arguing *X*,' strongly implied the prosecutor was in fact asserting the validity and relevance of *X*, but, for lack of time, was concentrating on other presumably more important topics." (*Id.* at p. 1107.) The Court found the prosecutor's use of this technique to refer to biblical support for capital punishment was improper, but concluded the remarks were not unduly prejudicial under the circumstances presented. (*Ibid.*; see also Webster's 1913 Dictionary < http://www.webster-dictionary.org/definition/Paraleipsis> [as of Apr. 25, 2016] [defining "paraleipsis" as "[a] pretended or apparent omission; a figure by which a speaker artfully pretends to pass by what he really mentions; as, for example, if an orator should say, 'I do not speak of my adversary's scandalous venality and rapacity, his brutal conduct, his treachery and malice'"]; Merriam-Webster Online Dictionary <http://www.merriam-webster.com/dictionary/apophasis> [as of Apr. 25, 2016] [defining "apophasis" as "the raising of an issue by claiming not to mention it (as in 'we won't discuss his past crimes')"].)

[21] The Attorney General contends Dean forfeited this claim because his counsel failed to object to the prosecutor's comment. Ordinarily, we would agree. This final series of improper comments, however, followed more than a dozen objections by defense counsel, including objections to the prosecutor's accusation she had raised a sham defense, that were consistently overruled by the court. After the prosecutor completed his argument and before the jury had recessed, defense counsel moved for a mistrial, based in part on the prosecutor's comment on Dean's failure to testify. Before denying the motion, the court chastised her for making inappropriate speaking objections. Under these circumstances counsel's failure to object falls within the exception to the rule for instances when the "'misconduct [is] pervasive, defense counsel [has] repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile.'" (*People v. Friend* (2009) 47 Cal.4th 1, 29; see *People v. Hill, supra,* 17 Cal.4th at pp. 821, 836 [same]; *People v. Pitts*, *supra*, 223 Cal.App.3d at p. 692 ["the rule is not applicable where any objection by defense counsel would almost certainly have been overruled"]; see also *People v. Peoples* (2016) 62 Cal.4th 718, 801 [no forfeiture where defense counsel challenged propriety of prosecutor's remarks in closing argument through motion for mistrial before jury began deliberating].)

28

"Under the Fifth Amendment of the federal Constitution, a prosecutor is prohibited from commenting directly or indirectly on an accused's invocation of the constitutional right to silence. Directing a jury's attention to a defendant's failure to testify at trial runs the risk of inviting the jury to consider the defendant's silence as evidence of guilt." (*People v. Lewis* (2001) 25 Cal.4th 610, 670; accord, *People v. Tafoya* (2007) 42 Cal.4th 147, 184; see *Griffin, supra,* 380 U.S. at p. 615 ["the Fifth Amendment . . . forbids . . . comment by the prosecution on the accused's silence"].) "Where it is 'reasonably probable' that the prosecutor's comments misled the jury 'into drawing an improper inference regarding defendant's silence,' the remarks will be deemed to constitute *Griffin* error." (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1020 (*Denard*).)

*Griffin* "'does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses.'" (*People v. Thomas* (2012) 54 Cal.4th 908, 945; accord, *People v. Carr* (2010) 190 Cal.App.4th 475, 483.) The trial court here denied Dean's motion for a mistrial on the ground the prosecutor was commenting not on Dean's failure to testify but his failure to answer the police's questions when asked about the collision.

The court's reasoning was flawed. It is true Dean's failure to honestly answer questions about the van collision when interrogated by Detective Price was a proper topic for closing argument. But the prosecutor's long introduction to his criticism of Dean's dishonesty first focused the jury's attention on the absence of direct evidence as to what happened in the van, then stressed that Dean knew what had happened because he was there but had refused to answer those questions, and finally observed that Dean had not testified at trial. The only reason to have included that last point, artfully worded as it might have been, was to suggest to the jury that, if Dean could have supported his lawyer's theory that Batiste was killed by someone else while in Kennedy's car, he had the opportunity to do so in court. (Compare *People v. Hardy* (1992) 2 Cal.4th 86, 154 [two witnesses testified defendant had told them he knew the identity of the murderer; prosecutor's closing argument that, if defendant was not the actual killer, he would have

revealed that information to save himself "was clearly *Griffin* error as defendant was constitutionally entitled to be free of such adverse comment"] with *People v. Medina* (1995) 11 Cal.4th 694, 756 [no *Griffin* error; prosecutor's comments were directed to the general failure of the defense to provide an innocent explanation for the testimony of several witnesses who had seen defendant with a gun at the time of the charged robberies with no reference, express or implied, to defendant's own silence].) As the court explained in *Denard*, "[W]here the prosecutor refers specifically to the defendant's actions, 'there is a reasonable likelihood that a jury would construe or apply the prosecution's statement to mean that defendant refused to testify in front of the jury.'" (*Denard, supra,* 242 Cal.App.4th at p. 1021; see also *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1528 [prosecutor's comment the defendant was "'hiding from all of you'" could only be interpreted as referring to the defendant, as opposed to the defendant's defense or case]; *People v. Modesto* (1967) 66 Cal.2d 695, 710, disapproved on other grounds in *Maine v. Superior Court* (1968) 68 Cal.2d 375, 383, fn. 8 [finding *Griffin* error in prosecutor's argument that defendant was the only person who knew the facts and was "'just sitting'" in the courtroom].) The prosecutor's pro forma acknowledgment Dean had no obligation to testify did not cure this improper emphasis on Dean's failure to testify and thus to answer the questions raised by the evidence.[22]

> e. *Dean's defense was unfairly prejudiced by the prosecutor's improper comments during closing argument*

As the Supreme Court acknowledged in *Seumanu*, multiple instances of prosecutorial misconduct "may act synergistically to create an atmosphere of prejudice

---

[22]     Dean also contends the prosecutor committed misconduct by twice inserting his name into the hypothetical presented to the gang expert as the basis for his opinion Batiste's murder had benefited the gang, asking leading questions to witnesses that interjected evidence the witnesses could not provide, manipulating the scheduling of witnesses to impede the defense's opportunities for cross-examination and harassing a juror the prosecutor perceived as pro-defense. In almost all of these occasions, however, the court sustained objections by Dean's counsel and, in several instances, admonished the prosecutor, thereby alleviating the prejudicial impact of his conduct.

30

more intense than the sum of its parts." (*Seumanu, supra,* 61 Cal.4th at p. 1350; see also *People v. Hill, supra,* 17 Cal.4th at p. 845; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1207; *People v. Woods* (2006) 146 Cal.App.4th 106, 117.) "In assessing the effect of the misconduct, we must factor in the '"special regard the jury has for the prosecutor,"'" as well as the conduct of the court in addressing the misconduct. (*Woods,* at p. 117.)

To some extent, the prejudice to Dean was preordained when the prosecutor, after dismissing the case to avoid the unfavorable in limine ruling, won the right to present evidence about the Banks and Powers murders, neither of which had any link to Dean. Once allowed, however, that evidence became fair game for the defense to use as it could, in this case, pointing to the bloody seats in Kennedy's car and raising the possibility that Batiste had been attacked in the car. The absence of DNA testing of that blood was properly elicited from the IPD detective called to discuss the Powers murder, who for unknown reasons did not remember directing the blood be tested. When Dean's counsel in her closing argument mentioned the lack of DNA testing, the court sustained the prosecutor's objection but failed to give a curative instruction or admonition. Instead, the court authorized the prosecutor to assert facts not in evidence with no possibility of response from Dean. The prosecutor's subsequent overstatement of the scope of the DNA evidence, as well as his scathing remarks about defense counsel's character in proffering a sham defense—pointedly directed at the crux of the defense's theory of the case— undoubtedly caused the jury to view Dean's defense with skepticism, if not incredulity. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305 [defendant asserting prosecutorial misconduct must establish a reasonable likelihood the jury construed the remarks in an objectionable fashion]; accord, *People v. Duff* (2014) 58 Cal.4th 527, 568.) As the Supreme Court cautioned in *Seumanu,* "'[a]n attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.'" (*Seumanu, supra,* 61 Cal.4th at p. 1338; see *People v. Espinoza* (1992) 3 Cal.4th 806, 820 ["[i]ncluded within the deceptive or reprehensible methods we have held to constitute prosecutorial misconduct

31

are personal attacks on the integrity of opposing counsel"].) Had the trial court sustained Dean's repeated objections to the prosecutor's inflammatory argument, we might conclude any prejudice had been mitigated. However, the court failed to assert control over the prosecutor; and, apparently emboldened by the court's denial of those objections, the prosecutor continued to attack defense counsel. (See *People v. Vance, supra,* 188 Cal.App.4th at p. 1207 ["[t]he trial court's reactions and inactions to the misconduct only aggravated the situation by removing the one restraint that might have operated on the jury"]; *People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1259 [faulting trial court for failure to restrain prosecutor's inflammatory argument].)

Any reservation we might otherwise have as to whether Dean was prejudiced by the prosecutor's misconduct—that is, whether it is reasonably probable Dean would have received a better result in the absence of these improper comments (see *People v. Charles, supra,* 61 Cal.4th at p. 327; *People v. Watson* (1956) 46 Cal.2d 818, 836)—is overcome by the prosecutor's subsequent statements starkly calling attention to Dean's failure to testify. "The effect of *Griffin* error is assessed under the standard of prejudice set forth in *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705]. That is, 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" (*Denard, supra,* 242 Cal.App.4th at p. 1022, fn. omitted; accord, *People v. Sanchez, supra,* 228 Cal.App.4th at p. 1534.) That standard is only met when the evidence of defendant's guilt is so strong as to leave no doubt that the jury would have reached the same result in the absence of the error. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1223; accord, *Denard,* at p. 1022.) As the *Denard* court further explained, the "Supreme Court has held most indirect *Griffin* error—where the prosecutor's remarks contain no references, express or implied, to defendant's silence—to be harmless. [Citations.] . . . '[I]n order for *Griffin* error to be prejudicial, the improper comment or instruction must either "serve to fill an evidentiary gap in the prosecution's case," or "at least touch a live nerve in the defense."'" (*Denard,* at p. 1022.) Here, the prosecutor's remark was explicit, not oblique, pointing

directly to Dean's exercise of his right not to testify. And the comments were specifically intended to fill the evidentiary gap in the People's case: The evidence established that Dean was in the van when it crashed around 1:30 a.m. with a severely injured Batiste inside and that Dean's DNA was present on the back of Batiste's shirt. But there was scant evidence as to what had occurred during the preceding three hours once Powers and Batiste left the Inglewood motel together in Kennedy's car. Dean's initial lie to Detective Price denying he had been in the van and, of at least equal significance, his subsequent silence about the incident were presented to respond to defense counsel's attempt to exploit those unanswered questions.

This was not an easy case: The jury deliberated five and one-half days and found Dean not guilty of first degree murder. Moreover, the misconduct at issue occurred during the prosecutor's rebuttal argument, "an especially critical period of trial" (*People v. Pitts, supra,* 223 Cal.App.3d at p. 694), immediately before the jury began deliberations. As one court long ago explained, "[W]here as here, in a closely balanced criminal case, misconduct is repeated and persisted in, . . . and is so pronounced and pernicious that it is not in human nature to forget or disregard its prejudicial effect, then . . . the only remedy remaining is to be found in a reversal of the judgment." (*People v. Edgar* (1917) 34 Cal.App. 459, 471, quoted in *People v. Vance, supra,* 188 Cal.App.4th at p. 1207.) In light of the sensitive stage of the proceedings in which the misconduct occurred, we cannot conclude the prosecutor's conduct, and the court's failure to control that conduct, were harmless under either the state law *Watson* standard or the federal *Chapman* standard for constitutional error.

33

## DISPOSITION

The judgment is reversed, and the matter remanded for a new trial.


PERLUSS, P. J.


We concur:



ZELON, J.



SEGAL, J.